IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| Joanne Villalon, individually and as next friend of Sofia Longoria, a minor, and as representative of the estate of Fernando Longoria, Emily Garcia as next friend of Nathan Lee Longoria and Carlos Lee Longoria, minors<br>　　　　*Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| VS | §<br>§ | C.A. NO. _____ |
| Cameron County, Texas, Sheriff Omar Lucio, Infirmary Supervisor Dean Garza, Lieutenant Mike Leinart John Doe nurses and John Doe Jailers<br>　　　　*Defendants* | §<br>§<br>§<br>§<br>§<br>§ | |

---

**PLAINTIFFS' ORIGINAL COMPLAINT & DEMAND FOR JURY**

---

Respectfully submitted,

**LAW OFFICE OF EDDIE LUCIO**

*/s/ Eddie Lucio*
Eddie Lucio
Federal Id. No.
State Bar No. 00791145
914 E. Van Buren
Brownsville, Texas
(956) 546-9400
(956) 750-8807 Facsimile
elucio@luciolaw.com

**ATTORNEY FOR PLAINTIFFS**

## TABLE OF CONTENTS

Nature of the Case………………………………………………………………....…3

Jurisdiction…………………………………………………………………………4

Venue……………………………………………………………………………..…….5

Parties …………………………………………………………………………………5

General Allegations………………………………………………………………..…7

Facts ……………………………………………………………………………......…8

     Background………………………………………………………………8
     Booked and Processed - No History of Problems…....……………………...………10
     Callously indifferent despite knowledge of problems………....………..............……11
     Spoliation of Evidence……………………………………………………… 17
     Policy of failing to transport……………………………………………....………18
     Policy of Medical Care Rendered by Nurses …………………………………………19

Causes of Action…………………………………………………………………20

     Claims Under 42 U.S.C. § 1983 …………………………………………………20
        a.  Qualified Immunity Under § 1983………………………….…………29
        b.  Municipal Policy……………………………………………………31
        c.  Acts of Final Policy Makers………………………………………32
     Spoliation Cause of Action……………………………………………………33
     Wrongful Death Cause of Action…………………………………………………33
     Survival Cause of Action……………………………………………………34

Damages………………………………………………………………….............…35

Attorney's Fees and Costs …………………………………………………………35

Punitive Damages …………………………………………………………...........…35

Jury Demand…………………………………………………………………36

Request for Injunctive and/or Declaratory Relief………………………………………36

Prayer………………………………………………………………………………37

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW Joanne Villalon, individually and as next friend of Sofia Longoria, a minor, and as representative of the estate of Fernando Longoria, Emily Garcia as next friend of Nathan Lee Longoria and Carlos Lee Longoria, minors, Plaintiffs in the above-styled and numbered civil action, and file their Original Complaint against Cameron County, Texas, Sheriff Omar Lucio, Infirmary Supervisor Dean Garza, Mike Leinart, John Doe nurses and John Doe Jailers and for cause of action would show the Court and Jury the following:

## I. NATURE OF CASE

1.01    This is an action for Constitutional violations and state law personal injuries suffered by Decedent, Fernando Longoria, as a result of the unreasonable treatment, conditions, care, and isolation while incarcerated at the County Jail.   Plaintiffs bring this action for compensatory damages under 42 U.S.C. § 1983 because Defendants jointly and severally deprived decedent of his federally-protected right to be free from unlawful seizure, cruel and unusual punishment and because they denied him due process of law.  U.S. CONST. amends. IV, VIII and XIV[1].

1.02    As a direct result of the policies, practices, customs and procedures of Cameron County Jail, decedent was deprived of his constitutional rights as guaranteed to him by the Amendments to the United States Constitution.  Defendant Sheriff, Defendant Garza and Defendant Leinart are policy makers within the County Jail.   Defendant jailers and nurses acting in the course and scope of their employment with the County, and acting under color of state law, unjustifiably isolated and failed to medically treat the decedent until he died.   Said actions were taken under circumstances where no reasonable nurse or jailer would have done so.   Under long established

---

[1] Fernando Longoria is 1 of 2 young men who have recently died while in the care and custody of Defendants.

law on unlawful seizure, cruel and unusual punishment and due process, the individual Defendants are not entitled to qualified or other immunity for these actions.

1.03    The unconstitutional and tortious acts of the individual defendant jailers were not isolated incidents.  Rather these acts were consistent with a custom, pattern and practice of the Cameron County Jail of failing to properly train and supervise its nurses and jailers in these critical care taking responsibilities and failing to respond to decedents screams for help.

1.04.    Thus, beyond compensating Plaintiffs for their continuing injuries, this action seeks to redress the unlawful municipal customs, policies, patterns and practices pursuant to which defendants, acting under color of law both independently and in concert, violated decedent's clearly established rights as guaranteed by the Fourth, Eighth and Fourteenth Amendment to the United States Constitution.

1.05    As a result of the defendants' tortious and unconstitutional conduct, Plaintiffs seek relief for the defendants' violation of decedent's rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, and of the rights secured under the laws of the State of Texas.  Plaintiffs seek damages, compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys fees, and for such other and further relief as this court deems equitable and just.

## II. JURISDICTION

2.01    This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988, and the Fourth, Eighth and Fourteenth Amendment to the United States Constitution and pursuant to the common law of the State of Texas.  Jurisdiction is conferred upon by this Court by 28 U.S.C. §§ 1331, 1332 and 1343.

2.02    Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims arising under the laws of the State of Texas and seeks recovery under the Wrongful Death and Survival Statutes of the State of Texas as allowed by law.

## III. VENUE

3.01    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because the acts, events or omissions giving rise to this claim occurred in Cameron County, Texas, which falls within the United District Court for the Southern District of Texas, Brownsville Division.

## IV. PARTIES

4.01    Plaintiff, Joanne Villalon is the widow of the deceased and mother of the deceased's minor child and is and was at all times material to this complaint, a citizen of the United States and resident of the State of Texas.

4.02    Plaintiff, Emily Garcia is the ex-wife of the deceased and mother of the deceased's minor children and is and was at all times material to this complaint, a citizen of the United States and resident of the State of Texas.

4.03    Defendant Cameron County Texas (herein "Cameron County") is a county of the State of Texas. Cameron County funds and operates the Carrizalez-Rucker Detention Facility (herein "the County Jail"). Cameron County is responsible for the formulation and implementation of certain policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. Cameron County is also responsible for ensuring that all of its facilities, including the Carrizalez-Rucker Detention Facility, are in compliance with federal and state law, department or agency policies, rules, and regulations, and related standards of care. Cameron County is the

employer of certain Defendant Unknown Cameron County Correctional Officers and Unknown Nurses and is responsible for the training and supervision of such Defendant Unknown Cameron County Correctional Officers and Unknown Nurses. At all relevant times alleged herein, the County Jail was acting under the color of state law and by and through its agents or employees, who were also acting under color of state law and within the course and scope of their agency or employment. Cameron County may be served by serving its County Judge, Pete Sepulveda, Cameron County Administration Building, Second Floor, 1100 E. Monroe St., Brownsville, Texas 78520.

4.04    Defendant, Sheriff Omar Lucio, (herein "Sheriff Lucio") is a resident of Cameron County, Texas.  At all relevant times alleged herein, Sheriff Lucio, was acting under the color of state law.  He is sued in his individual capacity.  Defendant may be served at 7300 Old Alice Rd., Olmito, Texas 78575.

4.05    Defendant, Infirmary Supervisor Dean Garza, (herein "Supervisor Garza") is a resident of Cameron County, Texas.   At all relevant times alleged herein, Supervisor Garza, was acting under the color of state law.  He is sued in his individual capacity.  Defendant may be served at 7300 Old Alice Rd., Olmito, Texas 78575.

4.06    Defendant, Lieutenant Mike Leinart, (herein "Lt. Leinart") is a resident of Cameron County, Texas.  At all relevant times alleged herein, Lt. Leinart, was acting under the color of state law.  He is sued in his individual capacity.  Defendant may be served at 7300 Old Alice Rd., Olmito, Texas 78575.

## V.  GENERAL ALLEGATIONS

5.01    When the Fernando started suffering seizures, instead of taking him to the hospital, the Defendants locked Fernando in a tiny, isolated room commonly referred to as "el poso" which translates to "the hole".   The hole has no windows, drinking faucet, toilet, sink, or bed.   By locking Fernando in the hole, Defendants prevented him from being able to contact to the outside world for help.  The deceased spent the last agonizing days of his life suffering multiple seizures, crying, hallucinating, screaming for help and painfully banging the walls, the floor and anything else he could hit with any part of his body until his horribly bruised and lifeless body was eventually found covered in his own urine and feces. The whole time the Jail staff stood by callously watching and ignoring his cries for help.  In essence, Fernando was monitored to death.

5.02    Defendant Cameron County, Defendant Sheriff, Defendant Garza and Defendant Leinart are liable for their official policies and practices that failed to adequately train Defendant John Doe nurses and John Doe jailers and failed to ensure they were knowledgeable and skilled in official policies, procedures and techniques relating to the humane housing and treatment of detainees as well as the provision of necessary medical care.

5.03    Further, the County Jail's detention policies and ordinances failed to provide for the proper supervision from the commencement of the process of placing decedent in the hole to the failing to provide prompt and necessary medical attention. This failure to supervise and/or train includes a failure to discipline and/or to intervene and stop Nurses and Jailers from continuing their unconstitutional course of actions. Plaintiffs allege that these policies and practices of the the County Jail were unconstitutional on their face. In these failings, Defendants violated the Constitutional rights of decedent and Plaintiffs.

5.04    At all times relevant hereto, personnel at the County Jail were required to keep Fernando safe and free from physical injury, harm, or death.

5.05    At all times relevant hereto, personnel at the County Jail were required to keep Fernando safe and free from psychological injury or harm.

5.06    All times relevant hereto, personnel at the County Jail were required to screen and evaluate inmates placed in custody to determine if hospitalization was necessary or merely place inmates in the hole.

5.07    At all times relevant, personnel at the County Jail were required to screen and evaluate the mental and physical status of persons placed in the hole to determine if hospitalization was necessary.

5.08    At all times relevant hereto, the County Jail was required to train its jail personnel on the method and means of evaluating persons placed in custody to keep them safe from physical or psychological injury, harm, or death and transport them to a hospital when necessary.

## VI.  FACTS

Background

6.01    Fernando Longoria was a 29 year old young man, a devoted husband and father to 3 young children at the time of his untimely death.   He was well-liked by his co-workers and friends and loved dearly by his entire family.  His widow, Joanne Villalon, is mother to his 2 year old baby girl Sofia.  His ex-wife, Emily Garcia, is mother to his 2 little boys, 11 year old Nathan Lee Longoria and 7 year old Carlos Lee Longoria.  Though Fernando was divorced from his first wife, he spent precious time with all his kids and worked hard to care for and support all of them.

6.02    Shortly before his death, Fernando had left his position as a manager at a local restaurant to attend school and was working at Prodigy Cuts at the time of his passing.   His wife Joanne was a stay at home mom.   Together they were purchasing a modest but comfortable home. Fernando was paying his mortgage and all living expenses.

6.03    Fernando was in perfect health.   He had no physical, mental and/or psychological problems prior to this incident.   He had not spent anytime in any hospital for any injuries nor had he been treated for any physical or mental problems.   He did not suffer from depression or any psychotic disorders.   He was physically active and had no known physical or mental impediments.   He had never suffered any type of seizures during his childhood or adult life.

6.04    In 2014, Fernando was stopped by the Brownsville Police Department and arrested for the misdemeanor offense of Driving While Intoxicated.   After he was booked and processed, Fernando posted bond and hired a criminal defense attorney to take his case to trial.   He requested a trial setting and attended numerous court appearances.   Shortly prior to his trial setting, Fernando's counsel was able to secure a plea bargain offer from the Cameron County District Attorney's office wherein Fernando would be able to avoid the risk of a lengthy and expensive probation if he would agree to serve a 30 day 3 for 1 jail sentence.   In other words, Fernando would be able to take care of his sentence by serving 10 of his 30 days at the Carrizales-Rucker Detention Facility.   After thoughtful consideration, Fernando and his wife made the difficult decision to accept the 30 day 3 for 1 jail sentence, rather than risk the consequences of a loss at trial.

6.05    On Friday, January 16, 2015, Fernando woke up, got dressed and kissed his wife good-bye and drove to the Cameron County court house.   She had no idea that this would be the last

time she would see him alive.  Fernando appeared before the Cameron County Judge for County Court at Law No. 3 and entered his plea of guilty.  In accordance with the plea bargain negotiated by his counsel, the Judge entered the 30 day jail sentence.  That same morning, Fernando agreed to be taken into custody to begin serving the 10 days needed to satisfy his sentence.

Booked and processed - No history of problems

6.06    Upon entering the County Jail, Fernando was processed and booked.    Fernando underwent a physical and psychological evaluation performed by the Jail staff.  This evaluation is designed to detect any signs of suicide and any mental, physical or medical impairments.  The evaluations revealed that Fernando had no such problems.   As part of the booking process, Fernando was further evaluated by a jail nurse.  This nurse performed additional medical and psychological tests on Fernando.  Again, these tests revealed that Fernando was both physically and mentally healthy upon being booked into the jail.  Though the Jail has an infirmary unit, no recommendation was made that Fernando had any condition requiring that he visit or be placed in the infirmary.

6.07    After these evaluations were completed, the results of the evaluations and Fernando were both transferred to the classification department.  The Jail's classification department then did an extensive criminal background search to determine where to place Fernando within the Jail.  A county jailer then filled out a classification form wherein an offense and disciplinary scale was applied to Fernando.  Based on the results of Fernando's classification scale, the Jail concluded that Fernando qualified for the Jail's trustee classification.

6.08    Fernando was then given a trustee form requiring his signature and placed in a holding tank until he could be placed within the Jail's trustee unit.  The trustee unit was located within

one of the Jail's four units, either Alpha, Bravo, Charlie or Delta.   Each of these units is further broken down into 6 sections.   Plaintiffs have been unable to determine in which of the four units and sections Fernando was originally placed.

6.09    As such, the Jails own internal processes revealed that Fernando was in excellent physical and mental health and of no physical threat to others or himself.   Based on his evaluations, Fernando was given the freedom and flexibility to leave his jail cell throughout the day. Fernando's trustee status also allowed him to work within the Jail and he was accepted into the Jails PAW (prisoners at work) program. .   It is unknown what specific work duties were given to Fernando while incarcerated.

Callously indifferent despite knowledge of problems

6.10    The afternoon of Sunday, January 18th, (3 days into his sentence) fellow detainees began screaming for Jailers to help Fernando as he was having a violent seizure.   Jailer Lazo is called to Fernando's cell in A2 and notices that Fernando is sweating profusely.   Jailer Lazo notices that Fernando's eyes look lost.   Medical nurse Rodriguez is called to the scene and instructs the Jailers that Fernando's state is such that he needs to be taken to the infirmary.   Pursuant to jail policies, no ambulance is called to the scene though Fernando suffered a seizure.   According to the jailer report, Fernando is unable to lift himself up from his bed so the jailers assist him in getting off his bunk and place him on a wheelchair.   Interestingly, the nurse's notes of this same incident indicate that Fernando decided to jump off his bed and almost hit his head on the bed located on the opposite side of the cell.   Thus, neither of these 2 separate records indicate that Fernando sustained a head injury.   However, when the medical examiner performing the autopsy

inquired as to the cause of a visible head injury to Fernando's skull, the jail responded that

Fernando hit his head on a bed:

> contact the jail staff and was informed that the day prior Mr. Longoria had been hitting a
> wall. Dr. Miller pointed out a small abrasion to the underlying skin of the skull.
> Information was obtained that the deceased had also hit himself on a bunk while at the
> detention center. Dr. Miller stated there was concern about the different color of blood in

6.11    Per the Jail's own records, Defendants have knowledge that Fernando underwent a

violent seizure.  Seizure activity put the Defendants on notice that Fernando needed emergency

medical care and needed to be hospitalized immediately.  Tests needed to be run to determine the

cause of the seizures so as to help Fernando and to prevent further seizure activity.  Though this

seizure required immediate hospitalization, the County Jail ignored his condition and pursuant to

county policies merely shuffled Fernando from cell A2 to holding tank 11.  Fernando continued

exhibiting signs that he needs immediate help and Defendants continued watching him suffer.

6.12    By Tuesday, January 20th, according to Jail records, Fernando was talking to himself,

crying, yelling, making strange noises and beating on the walls.  Fernando was seen by a doctor

but, pursuant to Jail policies, he was not admitted to the hospital.  That afternoon he refused the

pulse, blood pressure and blood glucose checks. He later refused to take the medicines that had

been prescribed to him.  He was no longer eating.  Fernando lost touch with reality and was now

incapable of accepting medical help from the Jail staff.

6.13    However, pursuant to its policies, instead of providing Fernando with emergency care the

County jail instead attempts to obtain Fernando's signature on a form indemnifying them from

liability.  This is unfair as the Defendants know that he he is delusional and no longer capable of

providing consent and in fact did not consent.  Astonishingly, in its own form, the County Jail even acknowledges that "medical problems or consequences" could result from failure to receive medical treatment.   Yet, as the following form indicates, Defendants were more concerned protecting themselves than Fernando:

> This refusal is at my own free will and accord. I will not, at any later time, a make a claim or file suit against Cameron County Jail Physician/NP/PA, Cameron County Health Department & employees and/or the Cameron County Sheriff's Department, for any medical problems or consequences resulting from my failure to receive medical treatment or follow-up treatment.
>
> Refuse to sign
> INMATE SIGNATURE AND ID#
>
> WITNESSED BY
>
> D. Sanchez
> MD/PA/NURSE/MEDICATION AIDE

6.14   Per jail records, Fernando no longer knew what day it was nor did he know where he was. He started beating the door so hard that his hands started to bleed.  Nurse notes indicate that Fernando continued to suffer from delusions and believed that 2 boys were trying to kill him with knives.  Jailer notes indicate that Fernando was exhibiting other delusional behavior.  That night he was again taken to the infirmary.  The Tropical Texas Crisis Hotline was notified.  The jail could have have easily called for an ambulance or made arrangements to have him transported to the hospital, instead they just locked him back up in an even more secluded padded cell to suffer the last days of his life inhumanely.

6.15    The afternoon of Wednesday, January 21st, (6 days into his 10 day sentence) Fernando is found unconscious on the floor of his padded cell.   Fernando has defecated on the floor and rubbed his feces all over himself and all over his padded cell.   The jail nurse on duty is present and aware of the psychotic breakdown that has just taken place.   However, jailers tell her that she has to wait a few minutes as they are busy handling the phones and cleaning the feces from the padded cell.   Rather than wait a few minutes so she can examine Fernando, the nurse leaves and tells the jailers to notify her later.   Though the act of rubbing feces on himself and on the walls placed the Jail on notice that Fernando needed to be hospitalized, Defendant's employees did nothing.   The nurse did not return for approximately 4 hours at which time, pursuant to jail policy, she continues to tell the Jailers that Fernando is fine and no hospitalization is necessary. The jail pursuant to its policy, goes about its process of again trying to get Fernando to sign forms that he is indemnifying Defendants for the consequences of refusing food, medicines and checks of his vital signs.    The Defendants make 3 different attempts to get Fernando to indemnify them, however, Fernando is unable to sign the forms indicating his refusal.

6.16    The night of Wednesday, January 21st, (the last night of Fernando's life) Jailer Monica Ybarra noticed that Fernando was again passed out on the floor and making strange gurgling noises.   Fernando was not responsive.   Jailer Ybarra asked Fernando several questions and Fernando was unable to respond.   Medical staff was called to Fernando's cell.   When medical staff arrived they merely requested the jailers to sit Fernando back up.   Pursuant to Jail policies, Medical staff then cleared him and advised the jailers that Fernando was ok.   Late that night, Jailer Ybarra hears Fernando screaming for help again.   Pursuant to jail policies, she ignores his screams.   Fernando has barely eaten in 3 days and has been refusing medicines.

6.17     The morning of Fernando's death, January 22, 2015, at approximately 4:30 a.m., Jailer Ybarra again noticed that Fernando was on the floor making strange noises and appeared to be semi-conscious.  Jailer Ybarra's notes indicate that Fernando has been making strange noises all night.   Medical staff was again advised of Fernando's condition.   Medical staff appeared at Fernando's cell and noticed that Fernando was mumbling to himself.  He was asked questions but his speech was now to low and no longer audible.   Again, pursuant to County Jail policies, Defendants make one last attempt to get Fernando to indemnify them from liability.  Fernando is unable to sign their form.  Medical staff merely instructs the Jail staff to sit Fernando back up inside his cell.  Pursuant to Jail policies, Medical staff then clears him and advises the jailers that Fernando is fine and does not need to be taken to the hospital.

6.18     At approximately 6:00 a.m. 2 jailers see Fernando suffering yet another seizure which leaves him unconscious on the floor.  Pursuant to jail policy, rather than call for an ambulance so that Fernando can be taken to the hospital, the jailers instead called the infirmary staff.   At approximately 6:15 a.m., the infirmary staff shows up and views Fernando from outside his cell. They can see him passed out on the floor.  They began to scream at him from outside of his cell. Fernando is semi-conscious and making strange noises but is not responsive.  After being unable to get Fernando to respond, the nurses and jailers decide to open his jail cell.

6.19     Once inside, the medical staff with the help of the jailers lift Fernando off the floor as he no longer has control of his physical faculties.   At this point, Fernando can not even crawl let alone stand.  The jail personnel knew or should have known that Fernando was in grave danger but continued to act with callous indifference and reckless disregard for his safety.  The medical staff could have called for an ambulance, but pursuant to Jail policies, they did not.  Instead, they

merely sat him up and put a sandwich on his lap and put an apple in his hand and left him in the padded cell.  The medical staff then cleared Fernando and pursuant to Jail policy advised the jailers that Fernando was ok and therefore did not need to be taken to the hospital.  Fernando was now living the last few minutes of his life while outside the jailers and medical staff who held the keys to his safety went about their business as usual.

6.20    At approximately 6:30, jailer Saavedra looks inside Fernando's jail. cell.  Fernando is sitting motionless on the floor in the same spot where he was left.  A sandwich is on his lap and an apple is in his hand.  Fernando is still alive as the Jailer can still hear him making strange and weird noises.  According to his own notes, the jailer stares at him for an entire minute but does nothing.  Pursuant to jail policy, this jailer does not have the authority to call for an ambulance. The jailer does have the power to call the infirmary, but he chooses not to.  So he merely watches Fernando breathe the last breaths of his life alone in his cell.  Fernando can no longer scream for help.  The jailer then sits back at his desk and continues working on his jail logs.

6.21    At approximately 6:40 a.m., jailer Saavedra decides to take a coffee break and leaves the area of Fernando's padded cell.  At about 6:50 a.m. the jailer returns from his coffee break and goes to Fernando's jail cell.  The jailer stands outside the jail cell and again looks inside.  He sees Fernando sitting motionless in the same spot that he was left close to an hour earlier.  This time the jailer notices that Fernando's eyes are open and facing upward towards the ceiling. Fernando's skin color has now turned visibly yellow.  Fernando is no longer making any noises. The sandwich is still on his lap and the apple is still in his hand.

6.22    Pursuant to jail policy, the jailer does not open the cell door but merely screams at Fernando from outside the cell.  Fernando does not respond.  Rather than open the door, the

Jailer instead hits a button on the outside of the cell in order to flush the toilet inside the jail so as to get Fernando's attention.  Another jailer is called and cell door is finally opened. The infirmary staff is called.  One of the jailers who is a certified EMT determines that Fernando has no pulse and is no longer breathing.

6.23    Five minutes later, at approximately 6:55 a.m., the infirmary staff shows up and performs CPR on Fernando to no effect.  At this point, Fernando is dead, the decision is finally made to contact an ambulance so that Fernando can be taken to the Hospital.  At approximately 7:05 the ambulance arrives to take Fernando's body to the Hospital  where he is pronounced dead.   The medical examiner also found different colors of blood within the chambers of Fernando's heart.

Spoliation of Evidence

6.24    Throughout the incidents described above, a video camera is pointed directly at the "hole" where Fernando is kept.   This camera is there so that a video record can be made of whether the jail staff is complying with their duty of routinely observing detainees such as Fernando.  It records who is checking up on Fernando and at what times they are checking up on Fernando.   However, according to jail records the video camera apparently and ***coincidentally stopped working*** about 8 hours prior to Fernando's death.  As such, no video record exists of the critical last hours of Fernando's life and of whether jailers and nurses were complying with their required observations[2].   Defendants had a legal duty to preserve this crucial evidence and breached said duty.

---

[2] As there are multiple cameras recording at all times within the county jail, the Jail has been placed on written notice to preserve and not destroy all other video recordings of the areas wherein Fernando was held.

Policy of failing to transport

6.25    The Jail has acknowledged its reluctance regarding the transporting of inmates to the hospital for treatment.  The jail's policy of not taking inmates to the hospital stems in part from the Jail's attempt at avoiding the payment of overtime wages.   In other words, Jailers must be paid overtime for the time spent transporting inmates to the hospital and for supervising the inmates while at the hospital.   Furthermore, the jail's policy of only staffing the bare minimum jailers in order to comply with State mandated standards also caused Fernando's death.  This is so as using available jailers to transport an inmate to the hospital causes the the guard-to-inmate ratio to fall below the state mandated standards.  The following newspaper articles shed light on the jail's rationale behind its medical care policies:

**By JACQUELINE ARMENDARIZ in the Brownsville Herald**

The Cameron County Commissioners Court on Thursday tabled discussion of privatizing the county's jail system. But while addressing the significant overtime accrued by guards, a jail administrator said that state-mandated standards haven't been met for the past six years.

Chief Jail Administrator Mike Leinart and Sgt. Sergio Moore Jr., an officer with the Carrizales-Rucker Detention Center, said the overtime pay is a result of the combination of a high number of inmates who require hospital visits, and housing federal and municipal inmates without enough compensation.

As the county deals with its own tight budget, guards have been paid overtime to comply with guard-to-inmate ratios required by the Texas Commission on Jail Standards, Leinart said. But this month the Cameron County jail division was reprimanded by the TCJS for another reason — during a surprise visit, inmates were found sleeping on the floor.

In response to a question about inmate population numbers, Leinart said: "We haven't been in compliance in six years."

"Don't say that out loud," Pct. 4 Commissioner Dan Sanchez said.



6.26    Transporting inmates to the hospital is expensive and strains the budget.    As such, Defendants created and implemented formal as well as informal policies through pattern and practice which prioritized the non-payment of overtime wages and protection of the minimum guard to inmate ratio at the expense of inmate health and safety.   These policies preclude and/or hamper the transportation of inmates, such as Fernando, to the hospital.

Policy of Medical Care Rendered by Nurses

6.27    It is the documented policy, practice and custom of Cameron County, that the medical staff at the jail will be staffed by Nurses. It is the policy custom and practice that the nurses are supervised by another nurse – the Nurse Supervisor.

6.28    According to the policies, custom and practices of Cameron County the Nurse Supervisor reports to and is supervised by a corrections officer with the rank of lieutenant.

6.29    The Nurses at the Cameron County Jail, as a matter of policy custom and practice, are required to provide comprehensive medical assessments of all inmates medical needs and their determination then dictates what medical care an inmate will receive and dictates to a large degree which inmates will receive medical care from a physician.

6.30    Cameron County has a contract with a physicians who report to Cameron County for "doctor call". Doctor call is not routine in that the doctor does not come the same day every week, nor does he or she necessarily come every week. Moreover, the doctors do not review or supervise the work of the Nurses. They do not review inmates medical charts to ensure that care being given is appropriate or warranted.

6.31    The "doctor call" doctor sees those patients that either request to see the doctor or the Nurse determines that the inmate should see a doctor. If an inmate, like Fernando, is no longer able or loses his ability to communicate his need to see the doctor, he is completely dependent on an Nurse to make that medical assessment. More so, if the inmate is kept in isolation.

6.32    The result of these policies, customs and practices is that the inmates at Cameron County Jail, such as Fernando, are completely dependent on an LVN to determine their medical needs.

6.33    Further, the LVNs use "doctor protocols" to render medical care. The use of written doctor protocols is a prohibited practice according to the Texas Board of Nursing.

> The specifics of how authorization occurs for a LVN or RN to implement a set of standard physician's orders are defined in the Texas Medical Board's (TMB) Rule 193 (22 Tex. Admin. Code §§193.1-193.12) relating to physician delegation. This rule holds out two (2) methods by which nurses may follow a pre-approved set of orders for treating patients:

1. Standing Delegation Orders; and/or
2. Standing Medical Orders.

These terms are defined in 22 TEX. ADMIN. CODE §193.2 but neither methods apply here. Instead, the Cameron County medical staff uses "doctor protocols."

A third term, "Protocols", is defined narrowly by the TMB and applies to RNs with advanced practice authorization (APRN) by the BON, or to Physician Assistants only:

(10) Protocols – Delegated written authorization to initiate medical aspects of patient care including authorizing a physician assistant or advanced practice nurse to carry out or sign prescription drug orders pursuant to the Medical Practice Act, Texas Occupations Code Annotated, §§157.051-157.060 and §193.6 of this title (relating to the Delegation of the Carrying Out or Signing of Prescription Drug Orders to Physician Assistants and Advanced Practice Nurses). The protocols must be agreed upon and signed by the physician, the physician assistant and/or advanced practice nurse, reviewed and signed at least annually, maintained on site, and must contain a list of the types or categories of dangerous drugs and controlled substances available for prescription, limitations on the number of dosage units and refills permitted, and instructions to be given the patient for follow-up monitoring or contain a list of the types or categories of dangerous drugs and controlled substances that may not be prescribed. Protocols shall be defined to promote the exercise of professional judgment by the advanced practice nurse and physician assistant commensurate with their education and experience. The protocols used by a reasonable and prudent physician exercising sound medical judgment need not describe the exact steps that an advanced practice nurse or a physician assistant must take with respect to each specific condition, disease, or symptom.

By definition, both vocational and professional nursing excludes "acts of medical diagnosis or the prescription of therapeutic or corrective measures" [TEX. OCC. CODE ANN. §301.002(2) and (5)]. Based on the above definitions in the TMB rules, RNs who do not have advanced practice authorization from the BON may not utilized "protocols" to carry out physician orders. Likewise, vocational nurses (LVNs) are also prohibited from utilizing protocols as defined by the TMB, as neither LVNs nor RNs may engage in acts that require independent medical judgment.

It is the policy, custom and practice of Cameron County for its Nurses to use "doctor protocols,"

despite their prohibition by the Board of Nursing. The use of doctor protocols in rendering

medical treatment to Fernando or any other inmate is per se inadequate medical care.

Failure to Train or Inadequate Training

6.34    Ultimately the training of all jail staff is the responsibility of Sheriff Lucio.  The training

provided by Cameron County is so inadequate as to constitute a failure to train. Members of the

jail staff are not instructed on differentiating between a mental health condition, head injuries and

side effects and/or symptoms of seizure activity.  Moreover, the treatment offered by staff is the

same for any inmate that is mentally incoherent regardless of the cause of their incoherency.

While jail staff will undoubtedly acknowledge that they are not equipped to deal with inmates

having psychotic episodes, they are also not trained to assess such episodes and seek medical

treatment. Fernando should have been transported to a hospital or MHMR, where physicians and

mental health providers could have treated him. Instead, he was observed to death in the hole.

This improper or inadequate training is deliberately indifferent to the medical needs of inmates

such as Fernando and was a direct cause of his death.

**VII.  CLAIMS FOR RELIEF**

**VIOLATIONS OF 42 U.S.C. SEC. 1983**

7.01    Plaintiffs hereby adopt, incorporate, restate and re-allege the above paragraphs inclusive,

with regard to all causes of action.

7.02    The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or
> usage, of any state or territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or any other person within the
> jurisdiction thereof to the deprivation of any laws, privileges or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

7.03    The elements of a cause of action under § 1983 against a governmental entity are:

a. Plaintiff is deprived of rights under the United States Constitution;

b. Such deprivation is caused by a person acting under color of state law;

c. The governmental entity adopted, or failed to adopt, a policy statement, ordinance, regulation or decision adopted and promulgated by the governmental entity's lawmaking officers or by an official to whom the law makers delegate law-making authority or a persistent, widespread practice of officials or employees of the governmental entity which, though not authorized or officially adopted and promulgated, the policy is so common and well settled as to constitute a custom that fairly represents policy of the governmental entity; and

d. The governmental entity was deliberately indifferent to the party's constitutional rights.

7.04    Facts supporting each of the elements of a § 1983 claim listed above are found in the Statement of Facts applicable to all claims, but may be summarized as follows:

a.  The County and its employees implemented policies providing for, or acts supporting, the promulgated policy of detainment of persons in "the hole" regardless of whether their medical, mental and/or physical condition required hospitalization;

b.  Failed to properly train, hire, control, discipline and supervise employees;

c.  Failed to establish and maintain a proper detention policy for people requiring medical attention;

d.  Failed to establish and maintain a proper policy for dealing with the mental and/or physical health of arrestees/detainees;

e.  Failed to establish and maintain proper policies for assurance of medical care from proper medical professional(s) to arrestees/detainees;

f.  Failed to establish and maintain proper policies for assurance of medical care of arrestees/detainees;

g.  Failed to establish and maintain proper screens for arrestees/detainees in order to rule out other causes of behavior and/or symptoms, such as intoxication, withdrawal, head injuries, physical and/or mental health issues;

h.  Failed to establish and maintain proper policies for checking previous medical history of arrestees/detainees when making medical decisions;

i.  Failed to establish and maintain proper policies for treating persons with unpredictable medical or mental conditions;

j.  Failed to design and establish an on-site medical services program to meet the medical needs of inmates (e.g., initial physical assessments, ongoing evaluation and treatment of serious medical conditions, and stabilization of urgent and emergency medical conditions.

k.  Failed operate its medical services program using corrections-experienced and professionally trained personnel.

l.  Failed to implement a written medical services plan with clear objectives, policies, procedures so as to adequately guide its nurses and jailers.

m.  Implemented policies which failed to comply with the Texas Commission of Jail Standards, ACA, NCCHC, state and federal correctional medical standards.

n.  Implemented policies creating a medical services service program which failed to provide medical services in a humane manner with respect to the inmates' rights to basic medical services.

o.  Implemented policies which precluded and/or hampered the referral to an appropriate off-site medical provider/facility for emergency treatment.

p.  Implemented a health assessment protocol which failed to include the following:

    i. A review of the intake screening results and the collection of additional data to complete the medical and mental health histories of inmates;

    ii. A complete and accurate recording of pulse, blood pressure, blood sugar levels and temperature;

    iii. A complete examination by a physician specialized in treatment of conditions and/or symptoms exhibited by inmates such as Fernando;

    iv. A review of the findings of the health assessment and tests, and identification of problems by a physician specialized in treatment of conditions and/or symptoms exhibited by inmates such as Fernando; and

    v. Initiation of therapy when appropriate;

q.  failed to established sick call policies that did not provide for presence of the jail physician a sufficient number of days per week in order to address medical care problems of inmates such as Fernando.

r.  failed to establish policies which provided a pharmaceutical program in accordance with federal, state and local laws that met the needs of inmates such as Fernando.

s.  failed to implement a mental health program which included screening, referral, diagnosis and treatment of mental health conditions.

t.  Failed to establish a health care/medical care system so provided must conform to state standards for medical care and treatment as established by the Texas Jail Commission. Generally, health care at the Detention Facilities should be equivalent to that available in the community.

u.  Promulgated, condoned or showed indifference to improper policies or customs; and

v. Continued such practices of improper policies or customs as to constitute custom representing policy.

7.05    These actions by the Defendants subjected Fernando to confinement with constitutionally inadequate medical services, and medication, such as:

a. Medical records that are inaccurate, incomplete, and not transmitted to the proper medical professional in the the County jail;

b. Confinement conditions that do not ensure safe, humane and decent conditions including the intake of food and water;

c. Complete failure to assess ongoing medical or mental concerns;

d. The custom and practice of only monitoring those inmates believed to be acting erratic rather providing medical treatment;

e. Staffing the jail with  nurses with no oversight or supervision by qualified medical personnel in violation of Texas Board of Nursing rules and standards; and

f. Requiring nurses to make medical assessments of all inmates without proper licensing, training or supervision.

7.06    The Individual Defendants, as applicable, intentionally, and with deliberate indifference, deprived Fernando of his clearly established federal constitutional rights, including, but not limited to:

a. His right to reasonably safe conditions of confinement;

b. His right to receive proper medical services and medications for any serious medical conditions; and

c. His right to be free from cruel and unusual punishment.

7.07    Each Individual Defendant had a duty to ensure that Fernando received proper medical care, food and water, yet failed to do so. The Individual Defendant's actions were more than negligent as Fernando's continued incoherence, obvious medical and mental issues, his previous medical history and lack of food and water during confinement were obvious to the Individual Defendants. Yet, each Individual Defendant consciously chose not to ensure that Fernando received adequate medical and mental care, or food and water. Defendants, through these actions, proximately caused the deprivation of Fernando's rights to due process of law and rights to be free from cruel or unusual punishment subjecting him to periods of incarceration under unduly painful, horrifying, and dangerous conditions resulting in the death of Fernando.   The actions of Defendants were singularly, or in combination, a legal cause of death to Fernando.

7.08    Fernando was in serious need of medical attention and treatment, as was well known to the Defendants. Nonetheless, the Defendants willfully and maliciously placed and kept Fernando

incommunicado in the the County Jail. The County and the Individual Defendants refused to summon adequate medical aid for Fernando.

7.09    At all times material hereto, the Individual Defendants were employees of the County, and within the course and scope of their employment and in furtherance of the duties of their offices or employment.

7.10    The Defendants, acting under color of law and acting pursuant to the customs and policies of the County deprived Fernando of rights and privileges secured to him by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and by other laws of the United States, by failing to provide proper medical treatment, by failing to protect him and through deliberate indifference to his medical needs, in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the cited constitutional provisions.

7.11    Defendants, acting through official policies, practices, and customs and with deliberate, callous and conscious indifference to the constitutional rights of Fernando, failed to implement and/or practice any policies, procedures and practices necessary to provide constitutionally adequate medical services to Fernando during his incarceration in the County jail and implemented defacto policies, procedures and practices which actually interfered with or prevented Fernando from receiving medical services and medication. Furthermore, the conditions complained of were not reasonably related to any legitimate governmental objective, as there is no legitimate governmental objective in failing to call in a medical doctor to assess an inmate, or to transport an inmate to receive medical services, or medical clearance.

7.12    Defendants clearly breached their constitutional duty to tend to basic human needs of persons within their charge, acting with deliberate indifference and subjective recklessness to the

clear needs of Fernando, of which they had subjective knowledge. Even the other inmates, laypersons, easily recognized the necessity for a doctor's attention. The individual Defendants had full knowledge of Fernando's medical needs. However, the Individual Defendants made a conscious decision, pursuant to the policies, practices or customs of the County and/or their inadequate training to place Fernando into "the hole" and to leave him there without providing him the necessary medical care, medicines, food and water as required under the United States Constitution.   Given Fernando's repeated seizures and symptoms of paranoia coupled with the statements regarding Fernando's actions while in the hole provided both by the Individual Defendants and inmates, the County and the Individual Defendants deliberately disregarded the serious risk of medical harm. Further, the County and the Individual Defendants failed to take the requisite steps to determine the true cause of Fernando's seizures and symptoms.

**a.  Qualified Immunity Under § 1983**

7.13    County employees can be entitled to qualified immunity to their individual liability but this immunity is waived if the complainant shows that:

> a. the individual's acts deprived the party of constitutional rights under color of law
>
> b. the deprived rights were clearly established and constitutional rights which existed at the time of the acts; and
>
> c. such acts were not objectively reasonable under the circumstances, that is, no reasonable official could have believed at the time that the conduct was lawful.

7.14    The Individual Defendants, persons acting under color of state law, enforcing the County policies and procedures for incarceration of debilitated persons, or by their failure to properly

train in the handling of such persons, deprived Fernando of his civil liberties without due process of law by failing to provide adequate medical assistance during his incarceration that lasted over 5 days. No reasonable official could have believed that failure to seek medical treatment or to ensure for such basic needs as the intake of food or water was lawful. Initially, the plan by the Individual Defendants was to simply observe Fernando. After two days passed, Defendants made the decision that Fernando was too paranoid and delusional to be checked for vital signs. At that same point, Individual Defendants made the decision to merely write in their forms that Fernando was no longer accepting food, water or medical treatment.   Individual Defendants never sought qualified medical assessment during Fernando's incarceration despite obvious signs of medical and mental need. The Individual Defendants knew that Fernando was having seizures, hallucinating, experiencing psychotic breaks, not eating, not drinking water and refusing medical assistance.   Adequate medical care does not include simply holding and observing someone to see if their condition improves.   In fact, such treatment is the exact opposite of adequate medical care.   Defendants still kept Fernando trapped inside the "Hole" without seeking medical assistance.   The acts of the Defendants, when viewed objectively, were unreasonable under the circumstances. Therefore, qualified immunity is waived in this case.

7.15    The Individual Defendants involved in this case, acting under color of law, were deliberately indifferent to the excessive risk to Fernando's health and safety in their acts, or failures to act. Such acts violated and deprived Fernando's clearly established constitutional rights and were not objectively reasonable.

7.16    The acts of the County and the Individual Defendants clearly violated established statutory or constitutional rights of which a reasonable person would have known, including the

constitutional rights of life and liberty, and against cruel and unusual punishment, afforded by the Eight and Fourteenth Amendments of the United States Constitution.

7.17    The acts of Defendants were so obviously and grossly wrong, that only a plainly incompetent entity or officer, or one who was knowingly violating the law, would have performed such an act, and therefore, Defendants are liable to Plaintiffs for the damages caused by their actions.

7.18    Plaintiffs have alleged acts or omissions sufficiently harmful to evidence deliberate indifference to the seriousness of the deceased's medical needs. Defendants denied Fernando humane conditions of confinement knowing of and disregarding an excessive risk to his health or safety. The Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.   Here the Defendants failed to act, despite their knowledge of a substantial risk of serious harm. In Plaintiffs' case, the Defendant's knowledge of a substantial risk of harm may be inferred by the obviousness of the risk.

7.19    The aforementioned acts resulted in the delay and ultimately the failure to provide any of the necessary medical treatment to Fernando, which in turn proximately caused his death.

**b.  Municipal Policy**

7.20    Municipalities may be held liable under 42 U.S.C. § 1983 for constitutional torts that are committed pursuant to a policy, procedure, practice, or custom of the municipality.   Even if the County Jail's practice of overlooking constitutional torts was not authorized by an officially adopted policy, the practice may be so common and well-settled that it fairly represents official policy.  *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

7.21    In the present case, the the County Jail's formal and informal actions in overlooking, hiding and/or tacitly encouraging misconduct constituted a policy, practice custom and procedure authorizing and allowing the inhumane treatment of Fernando that violated the civil rights of Fernando.  Consequently, the County is liable for harm caused to others, such as Plaintiffs, as a result of its policies, practices customs and procedures.

7.22    The County's acts and omissions, when viewed objectively, involved an extreme degree of risk, considering the probability and magnitude of harm to others. The County had actual, subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others including Fernando.

**c.  Acts by Final Policymakers**

7.23    Defendants Omar Lucio, Dean Garza and Mike Leinart were at all relevant times, final policymakers at the County Jail, with oversight responsibility over the Jail nurses and jailers present when during the inhumane treatment of Fernando.  Defendants Omar Lucio, Dean Garza and Mike Leinart had overall responsibility for the hiring, training, instruction, supervision and discipline of the nurse and jailers.

7.24    Upon information and belief, there was a custom, policy, pattern and practice in the County Jail, by and through its final policy makers, beginning years before the inhumane treatment of Fernando of condoning, encouraging, ratifying and acquiescing in the inhumane treatment of detainees.

7.25    The County, by and through its final policymakers, failed to adequately train, supervise, and/or discipline nurses and jailers concerning humane treatment of detainees.

7.26    By reason of the foregoing, this defendant acted with reckless disregard and deliberate indifference in the supervision, hiring, training, and discipline of the nurses and jailers thereby causing the death of Fernando.

7.27    As a direct and proximate result of said violations, Fernando was monitored to death, and suffered the damages described herein.

## (2)  SPOLIATION CAUSE OF ACTION

7.28    The above paragraphs are incorporated herein by reference for all purposes.

7.29    Plaintiffs bring this spoliation claim for the Defendants intentional and/or reckless destruction of evidence which was harmful to Defendants.

7.30    Defendants have in place a video recording system that records the activity in and around the "hole" where the decedent was held. The Defendants contend in their reports and records that they constantly monitored the deceased while he was in the "hole" and that they attempted to offer the decedent care while in said cell.  Defendants reports contend that the video recording system mysteriously went down and failed to record any of the events leading up to the time of Fernando's death.

7.31    Plaintiffs request damages, sanctions and a jury instruction in this regard.

## (3) WRONGFUL DEATH CAUSE OF ACTION

7.32    The above paragraphs are incorporated herein by reference for all purposes.

7.33    Plaintiffs bring this wrongful death action against Defendants for the death of Fernando for their own damages and for the damages to the other statutory beneficiaries arising from the injuries which caused Fernando's death. Defendants are liable as the injuries were caused by their

wrongful acts, neglect, carelessness, and by the wrongful act, neglect, and carelessness of their agents and employees as set forth above.

7.34    Plaintiffs request damages for the loss of consortium of the statutory beneficiaries resulting from the death of Fernando; loss of advice, counsel, companionship, society and affection; grief and mental anguish, bereavement and mental trauma, and emotional damages they suffered as a result of the death of Fernando.

7.35    As a direct and proximate result of Defendants' acts, Defendants caused the deceased to suffer injury and death, of which has caused the general damages requested by Plaintiffs in an amount in excess of the applicable jurisdictional amount, to be proven at trial.

7.36    The claims and causes of action for the wrongful death of the deceased are brought by Plaintiffs and on behalf of themselves and all rightful heirs, pursuant to Texas Civil Practice and Remedies Code sections 71.002-004.

### (4)  SURVIVAL CAUSE OF ACTION

7.37    The above paragraphs are incorporated herein by reference for all purposes.

7.38    As a direct and proximate result of the foregoing, Defendants caused the deceased to suffer injury and death, of which has caused the general damages requested by Plaintiffs in an amount in excess of the applicable jurisdictional amount, to be proven at trial.

7.39    The claims and causes of action for injuries to the health and person sustained by the deceased prior to his death are brought in this action pursuant to the Survival Act, Texas Civil Practice and Remedies Code section 71.021.

## VIII.  DAMAGES

8.01    The above paragraphs are incorporated herein by reference for all purposes.

8.02    As a result of the acts and of Defendants as described above, Plaintiffs have suffered severe injuries.  Plaintiffs have sustained loss of earnings and loss of earning capacity, past and in the future.   Plaintiffs have experienced great mental anguish, and will in all reasonable probability, continue to do so in the future by reason of the nature and severity of their injuries.

8.03    The defendants conduct demonstrates that Defendants engaged in an unlawful intentional course of conduct with malice and reckless indifference to the federal and state protected rights of the Decedent and Plaintiffs.  Defendants acted willfully, intentionally and/or with a reckless and callous indifference to the civil rights of the Decedent.  Plaintiffs seeks exemplary damages and punitive damages in an amount to be determined by the trier of fact.

## IX.  ATTORNEYS' FEES

9.01    Plaintiffs were required to hire an attorney to prosecute this claim.  Plaintiffs hereby sue for attorney fees.

9.02    Pursuant to 42 U.S.C s 1988, Plaintiffs request this court award Plaintiffs reasonable and necessary attorneys' fees and expenses which Plaintiffs have incurred and will continue to incur during all trial and appellate court proceedings.

## X.  PUNITIVE DAMAGES

10.01  All of the acts committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and said acts meet all of the standards for imposition of punitive damages.

## XI.  JURY TRIAL REQUESTED

11.01   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury.

## XII. REQUEST FOR INJUNCTIVE AND/OR DECLARATORY RELIEF

12.01   Plaintiffs' petition for an Order of this Court prohibiting the County Jail from continuing their current practice of providing medical care to inmates by nurses without proper supervision.

a. Plaintiffs are likely to succeed on the merits as they can establish that unsupervised nurses are providing medical care to inmates in violation of the Nursing Practices Act. Moreover, the nurses at the County Jail are using doctor protocols in violation of the Nursing Practices Act. The Board of Nursing is very clear in its proscription of the use of doctor protocols by LVNs and it is equally clear that the County Jail is using these protocols. As such, Plaintiffs are likely to succeed on the merits.

b. The denial of a constitutional right, if established, constitutes irreparable harm for purposes of equitable jurisdiction. Here, Plaintiffs can establish that Fernando was denied adequate medical care resulting in his death.

c. An injunction is in the public interest because Cameron County's delivery of constitutionally inadequate medical care has already cost Fernando his life. This constitutionally inadequate medical care continues to this day and unless enjoined, more citizens will be harmed.

12.02   Alternatively, Plaintiffs request the Court to issue a Declaratory Judgment that the medical care provided at the County Jail is constitutionally inadequate because:

a. Nurses are not properly supervised in violation of the Nursing Practices Act;

b. Nurses are providing comprehensive medical assessments, which is outside their

scope of practice;

c. Nurses are providing medical care pursuant to doctor protocols which is a violation of

Board of Nursing rules and regulations.

12.03   A Declaratory Judgment finding that the medical care is constitutionally inadequate as a

matter of law is necessary and critical to the public interest

### XIII.  PRAYER

13.01   **WHEREFORE**, Plaintiffs respectfully pray that Defendants be duly cited to appear and

answer herein, and that upon final trial of this cause, Plaintiffs recover a judgment against

Defendants for:

a.      Damages for past and future physical pain and suffering in the amount of $3,000,000;

b.      Damages for past and future mental pain and suffering in the amount of $3,000,000

c.      Damages for past and future lost earnings;

d.      Exemplary damages in the amount of $4,000,000;

e.      Prejudgment interest and post-judgment interest at the highest rates permitted by law;

f.      Reasonable attorneys' fees to the extent recoverable by law;

g.      All costs of court expended herein;

h.      All other relief, at law or in equity, to which Plaintiffs may be justly entitled.

13.02   Plaintiffs respectfully request that Defendants be cited to appear and answer herein, and

that Plaintiffs have judgment against Defendants, jointly and severally, for actual damages above

the jurisdictional minimum of the Court; and all other relief to which Plaintiffs are justly entitled,

at law or in equity.